(584 P.2d 145)
No. 49,705

STATE OF KANSAS, *Appellee,* v. MATTHEW TALSMA, *Appellant.*

Opinion filed September 15, 1978.

*Ernest H. Moulos,* of Wichita; and *Michael B. Rees,* of Topeka, for appellant.

*Kiehl Rathbun,* assistant district attorney; *Vern Miller,* district attorney; and *Curt T. Schneider,* attorney general, for appellee.

Before SPENCER, P.J., REES and MEYER, JJ.

MEYER, J.: This is an appeal from a proceeding in which appellant was found guilty of indirect contempt for refusing to answer questions during a district attorney's inquisition.

On June 8, 1977, appellant plead guilty to drug conspiracy charges and was sentenced. The prosecutor recited a plea agreement to the court. On October 10, 1977, the trial court modified appellant's sentence, placing him on probation for five years. That same day, appellant was served with a subpoena to appear at a district attorney's inquisition. The appellant and his attorney appeared at the district attorney's office on November 9, 1977, pursuant to the subpoena. At this time appellant was given a grant of immunity, but, on counsel's advice, refused to testify. The district attorney then contacted the trial judge by telephone, and the judge ordered appellant incarcerated overnight. The next morning, November 10, 1977, the trial court conducted a hearing on the matter of the inquisition. Appellant objected to being compelled to testify, stating that it was in violation of his plea agreement. The trial court found that the plea agreement was not violated by the inquisition and ordered appellant to appear at the district attorney's office on November 14, 1977, to answer questions. Appellant was then released.

On November 14, 1977, appellant appeared with counsel at the district attorney's office, but again refused to answer questions. The district attorney applied for a writ of attachment in contempt for appellant on November 16, 1977, and filed an accusation. The trial court gave appellant until November 28, 1977, to file an answer to the accusation, and set December 23, 1977, as a trial date for the contempt proceeding. Later the proceedings were continued to January 6, 1978, at which time the trial court found appellant guilty of indirect contempt of court and sentenced him to 90 days in jail or until such time as appellant elected to testify.

The appellant first contends that the inquisition was unconstitutional. The subpoena had never been filed with the court. Neither a judge nor a reporter was present at the inquisition. However, appellant did have advance notice and was represented by counsel. Therefore, we find that the inquisition was within the limits of K.S.A. 1977 Supp. 22-3101(2).

Appellant's primary contention is that he had a right to refuse to answer the inquisition questions. He bases this argument on two grounds: (1) that he is entitled to his Fifth Amendment right not to incriminate himself; and (2) that questioning him was in violation of his plea agreement.

As to the Fifth Amendment issue, appellant claims that the statute under which the district attorney granted him immunity would not protect him from prosecution by Arizona, Colorado, or the federal government.

We turn to federal law to see what that law is regarding prosecution in state courts other than the state where immunity was granted. In *Malloy v. Hogan,* 378 U.S. 1, 12 L.Ed.2d 653, 84 S.Ct. 1489 (1964), the court said:

". . . The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." (p. 8.)

". . . The State urges, however, that the availability of the federal privilege to a witness in a state inquiry is to be determined according to a less stringent standard than is applicable in a federal proceeding. We disagree. We have held that the guarantees of the First Amendment . . . are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment. . . . (p. 10.)

". . . What is accorded is a privilege of refusing to incriminate one's self, and the feared prosecution may be by either federal or state authorities." (p. 11.)

*Malloy v. Hogan,* supra, does not directly meet the situation where one state has granted immunity and another state intends to compel self-incriminating testimony. However, in *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 12 L.Ed.2d 678, 84 S.Ct. 1594 (1964), the court, at page 53, states:

"We have held today that the Fifth Amendment privilege against self-incrimination must be deemed fully applicable to the States through the Fourteenth Amendment. *Malloy v. Hogan,* [supra]. This case presents a related issue: whether one jurisdiction within our federal structure may compel a witness, whom it has immunized from prosecution under its laws, to give testimony which might then be used to convict him of a crime against another such jurisdiction."

At page 54, the court further states:

"Since a grant of immunity is valid only if it is coextensive with the scope of the privilege against self-incrimination, *Counselman v. Hitchcock,* 142 U.S. 547 [35 L.Ed. 1110, 12 S.Ct. 195], we must now decide the fundamental constitutional question of whether, absent an immunity provision, one jurisdiction in our federal structure may compel a witness to give testimony which might incriminate him under the laws of another jurisdiction. . . ."

At page 77, the *Murphy* court, after reflecting that the rule had been otherwise before, held as follows:

"The Court has today rejected that rule, and with it, all the earlier cases resting on that rule.

"The foregoing makes it clear that there is no continuing legal vitality to, or . historical justification for, the rule that one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction."

The high court then directly addressed the effect of their holding in *Murphy* on existing state immunity statutes as follows:

"We must now decide what effect this holding has on existing state immunity legislation. In *Counselman v. Hitchcock,* 142 U.S. 547 [35 L.Ed. 1110, 12 S.Ct. 195], this Court considered a federal statute which provided that no 'evidence obtained from a party or witness by means of a judicial proceeding . . . shall be given in evidence, or in any manner used against him . . . in any court of the United States. . . .' Id., at 560." (p. 78.)

Finally, in *Murphy v. Waterfront Comm'n,* supra, at pages 79-80, the court concludes:

"It follows that petitioners here may now be compelled to answer the questions propounded to them. At the time they refused to answer, however, petitioners had a reasonable fear, based on this Court's decision in *Feldman v. United States,*

supra, that the federal authorities might use the answers against them in connection with a federal prosecution. We have now overruled Feldman and held that the Federal Government may make no such use of the answers. Fairness dictates that petitioners should now be afforded an opportunity, in light of this development, to answer the questions. . . ."

In *In re Birdsong*, 216 Kan. 297, Syl. 4, 532 P.2d 1301 (1975), the Kansas Supreme Court held:

"The grant of immunity pursuant to the Kansas statute (K.S.A. 22-3415 [Weeks]) affords a witness protection from self-incrimination in state prosecutions and under the federal case law a similar protection from federal prosecution is afforded on account of any transaction or matter contained in any statement or about which such witness shall be compelled to testify. Such compelled statement or testimony shall not be used against such witness in any prosecution for a crime, state or federal."

Thus, it is the decision of this court that a district or county attorney in Kansas, by granting statutory immunity to a defendant, can ordinarily compel the answer of the defendant. According to the above United States Supreme Court authority, such immunity would be binding not only in Kansas but in federal court and other state courts as well.

Issues 2, 3, and 4 all concern the plea bargain and will be treated together. Did appellant have a right to refuse to answer questions that he claimed were in violation of his plea agreement, thereby subjecting him to the charge of indirect contempt? Both the appellant and the state argued vigorously concerning the terms of the plea bargain. The plea bargain recited to the trial court on the day of appellant's sentencing is as follows:

". . . The Defendants presently before the Court are charged with numerous other cases at this point, Your Honor. We have agreed that in exchange for a plea of guilty in this case and in exchange for a plea of guilty on the part of both defendants to 77 CR 517, and further in exchange for a plea of guilty on the part of the Defendant Talsma to 77 CR 512 that the State would recommend the minimum sentence in all of these cases, that the State would recommend that the sentences in these three cases run concurrently, one with the other. *The State would not request these Defendants to voluntarily testify against other co-defendants in these cases.* The State would dismiss all other pending actions against these two Defendants. The State would request that the Court, after having set these sentences concurrently with each other, to run these sentences concurrent with any further penalty Mr. Dunn might incur by virtue of a pending charge in Wellington, Sumner County, Kansas, for possession with intent to sell marijuana. Now, this is my understanding of the plea negotiations as they exist." (Emphasis added.) (Transcript of Guilty Pleas, pp. 5-6.)

Thereupon the court inquired of appellant's counsel as follows:

THE COURT: "Does that meet with your understanding, Mr. Vannerson?"
MR. VANNERSON: "That is my understanding, Your Honor." (Transcript of Guilty Pleas, p. 6.)

The appellant claims that the agreement as transcribed was not the actual plea bargain entered into by the parties. Appellant contests that portion of the plea bargain that states:

"The state would not request these Defendants to voluntarily testify against other co-defendants in these cases."

Because the recorded plea bargain is ambiguous, we have examined the entire record.

The U. S. Court stated, in *Blackledge v. Allison*, 431 U.S. 63, 74, 52 L.Ed.2d 136, 97 S.Ct. 1621 (1977), that although "declarations in open court carry a strong presumption of verity . . . the barrier of the plea or sentencing proceeding record . . . is not invariably insurmountable." The *Blackledge* test is whether the appellant's allegations "when viewed against the record of the plea hearing, were so 'palpably incredible' . . . so 'patently frivolous or false' . . . as to warrant summary dismissal." *Id.*, at page 76. The high court then found that, based upon the record of acceptance of the guilty plea and the ambiguity surrounding the bargaining process, the defendant should have an evidentiary hearing.

At page 48 of the Transcript of Motions on Inquisition for proceedings had on October 10, November 10, November 14, and November 18, 1977, the assistant district attorney stated to the court:

"Q. And what was the final agreement with regard to that point as you recall it?
"A. That we would not voluntarily ask him to testify against his co-Defendants or his friends or anyone else that might be charged in these cases. I assured Mr. Vannerson that in no case would we call his client as a witness in any capacity, voluntarily or involuntarily, while he was still in the penal system."

When questioned why the above quoted testimony had not been related to the court, the assistant district attorney replied, at page 50 of that transcript:

"For the reason that it was not a part of our plea negotiations. That was a private assurance from myself to Mr. Vannerson so that he could convey that to his client to put his mind at ease."

The state's claim that this assurance was not part of the plea bargain cannot be accepted. We note the assistant district attorney gave appellant's counsel his *assurance* expressly so that counsel could convey it to defendant *to put his mind at ease.*

We conclude that this express assurance was in fact a part of the plea bargain; therefore, we must determine whether or not appellant, while on probation, was "in the penal system." We conclude as a matter of law that the appellant is "in the penal system," so long as he is on probation. This term, to us, does not necessarily mean that a person be confined within the walls of a correctional institution. Certainly, for the duration of his probation—the remainder of five years—appellant *is* subject to certain rules and conditions of probation; should appellant violate those conditions, he would be subject to incarceration.

We must once again examine the record to see whether the trial court actually made an evidentiary finding of fact concerning the plea bargain. At page 28 of the Transcript of Proceedings held on December 23, 1977, the court states:

". . . I will tell you what I think on the matter; I think the whole matter revolves around what the term 'voluntarily testifying' means. *I am not inclined to go behind what was said in open court."* (Emphasis added.)

At page 4 of the Transcript of the Hearing of January 6, 1978, the court says:

"All right. The plea negotiations in this case that were recited to the Court at the time the plea was entered were, among other things, to the effect that the Defendant would not voluntarily testify against any of his co-Defendants. Mr. Vannerson has come in and testified in court that he thought this meant that the Defendant would not testify, period. *I think that his testimony is an attempt to collaterally attack the plea agreement that was recited in court. I am going to hold that the Defendant is not in this case voluntarily testifying.* To the contrary, his actions in this matter evidence an extreme reluctance to testify. He is fighting the matter tooth and toenail. It might be that the State would not have done what they had done if the word, 'voluntary,' had not been in the plea agreement. . . ." (Emphasis added.)

While the trial judge listened to the testimony of both attorneys relative to the claim of each as to the actual plea bargain, the above quotations by him indicate that he based his findings solely on what the plea bargain said as recited into the record *of the sentencing proceedings.* The trial judge, in fact, specifically states he is "not inclined to go behind what was said in open court" (obviously meaning, by the context in which it appears, the statement of the plea bargain as made at the time appellant was sentenced). At another time during the proceedings, the trial court referred to the testimony of the attorneys as an attempt to "collat-

erally attack" the plea bargain that was recited in court. The trial court made no specific finding as to what the plea bargain consisted of, unless we can infer that the trial court's finding was that such plea bargain was as stated in the record at the time of appellant's sentencing. Such might be a proper inference were it not for the fact that the trial judge stated he would not go behind the record, nor would he allow the terms of the bargain to be "collaterally attacked." In effect this had to refer to the record of the sentencing as distinguished from the entire record. The statements rebut any inference of a specific finding by the court, and could as well mean a refusal to make a finding as to the terms of the plea bargain.

We conclude that the trial court could have looked behind the announced plea bargain to the entire record in determining the terms of the plea bargain. He is not bound by the announced plea bargain if he finds conflicts after a study of the entire record.

The state has admitted of record that it would not call appellant as a witness "voluntarily or involuntarily, while he was still in the penal system," and it is bound by this admission. Since we have also concluded that at all times material to this case the appellant was in the penal system, we hold that the examination of appellant by way of inquisition was in violation of the plea bargain. Accordingly, the judgment of contempt must be reversed and vacated.

Reversed.